UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATALIE RYAN, | No. 2:23-cv-00324-TLN-JDP |
| Plaintiff, | |
| v. | **ORDER** |
| PROFESSIONAL DISC GOLF ASSOCIATION, et al., | |
| Defendants. | |

This matter is before the Court on Plaintiff Natalie Ryan's ("Plaintiff") Ex Parte Motion for a Temporary Restraining Order ("TRO"). (ECF No. 7.) The Court ordered expedited briefing. (ECF No. 9.) Defendants Professional Disc Golf Association ("PDGA") and Lowa LLC doing business as Disc Golf Pro Tour ("the Tour" or "DGPT") (collectively "Defendants") filed oppositions. (ECF Nos. 22, 23.) Plaintiff filed a reply. (ECF No. 25.) The Court held a hearing on May 10, 2023, and submitted the matter for written decision. For the reasons set forth below, the Court GRANTS Plaintiff's motion.

///
///
///
///

1

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a professional disc golfer who earns her living by traveling to and competing in professional disc golf tournaments throughout the United States. (ECF No. 7-3 at 2.) Plaintiff lives in and is a citizen of the state of Virginia. (ECF No. 4 at 2.)

The PDGA is a 501(c)(3) nonprofit organization headquartered in, Appling, Georgia, and is the governing body of professional disc golf. (ECF No. 22 at 2.) The PDGA establishes the sport's professional rules and its various divisions of competition, runs its own competitive events, and sanctions events run by other organizations. (*Id.*) PDGA-sanctioned events are divided into three primary levels: (1) professional; (2) amateur; and (3) junior. (*Id.*) The professional level, the level at issue here, is further divided into two divisions: (1) the Mixed Professional Open ("MPO"); and (2) the Female Professional Open ("FPO"). (*Id.*) The MPO is technically open to any player regardless of sex or gender[1] and the FPO is available only for female athletes to participate in. (*Id.*) As the governing body, the PDGA establishes policies governing eligibility for these gender-based divisions. (ECF No. 7-8.)

The DGPT is the official professional tour of the PDGA. (ECF Nos. 7-7, 22-1.) Accordingly, the DGPT runs PDGA-sanctioned events including silver events, elite events, and playoff events. (ECF No. 22-1 at 2.) As professional level events, these events have both an MPO and FPO division. The DGPT recognizes the PDGA as the governing body and the regulatory authority on the matter of eligibility for gender-based divisions. (ECF No. 7-7.)

As a transgender female, Plaintiff competes in the FPO. (ECF No. 7-3 at 2.) Indeed, Plaintiff has been a member of the PDGA since 2019, and at all times has been registered as female in accordance with her gender. (*Id.*) In 2022, Plaintiff competed in thirteen DGPT tournaments and three PDGA majors within the FPO division. (*Id.*) Plaintiff also competed in the 2022, OTB Open in the FPO division.[2] (*Id.*) As a result of her performance in the 2022

---

[1] During the hearing Plaintiff informed the Court there are presently zero women participating in the MPO Tour division and Defense Counsel noted they had no reason to believe otherwise. The MPO appears to function as a men's division. Indeed, this makes sense as the other division is a female division, created specifically for women to participate in.

[2] The OTB Open is the same Tournament at issue in the instant case.

DGPT tournaments, Plaintiff qualified to purchase a "tour card" for the 2023, DGPT season. (*Id.*; ECF No. 7-4.) This tour card provides automatic priority registration to all events for the upcoming professional tour season. (*Id.*) Plaintiff purchased her tour card and planned to complete in all 2023, Elite Series events, including the OTB Open. (*Id.* at 2–3.)

However, on December 12, 2022, the PDGA announced changes to its eligibility policy for transgender women set to go into effect in January of 2023 — the policy is titled "PDGA Policy on Eligibility for Gender-Based Division" (the "policy"). (*Id.*) The new policy created limits for transgender individuals seeking to participate in the FPO. (ECF No. 7-8.) For instance, it prohibits transgender men who are taking hormone treatment to increase testosterone from competing in the FPO. (*Id.*) It also imposes strict limitations on transgender women who seek to compete in the FPO — this policy is outlined in section C. (*Id.*) Section C has three parts. (*Id.*) Section C.1 imposes requirements related to hormone therapy and testosterone levels. (*Id.*) Section C.2 imposes requirements for gender affirming surgery and testosterone levels. (*Id.*) Section C.3 imposes a requirement that a trans-woman athlete must have transitioned prior to puberty, defined as during Tanner Stage 2 or before age 12, whichever is later. (*Id.*) Section C.3 also imposes a testosterone level requirement. (*Id.*) Because the PDGA is the governing body and the regulatory authority on this matter, the DGPT policy is aligned with the PDGA's policy. (ECF No. 7-7.) But for the requirement in section C.3, Ms. Ryan would qualify to compete in the OTB Open this Friday. As Plaintiff's counsel stated during the hearing on this matter, the only section at issue in the instant case is Section C.3.

Both Ms. Ryan and her counsel reached out to Mr. Jeff Spring, CEO of the DGPT to ensure Ms. Ryan was still eligible to play despite this new policy. (ECF Nos. 7-9, 7-10.) On January 6, 2023, after the new policy went into effect, Mr. Spring responded that "Natalie is not excluded from the DGPT in 2023." (ECF No. 7-10.) A month later, on February 7, 2023, Mr. Spring sent Ms. Ryan and her counsel a second email stating:

> We were recently informed by the PDGA that you are not eligible to compete in the FPO division at the DGPT events during the 2023 season. The PDGA is the regulatory authority for all decisions related to player eligibility at PDGA-sanctioned events, including all DGPT events. Information provided by the PDGA to the DGPT

3

>is the basis for all determinations as to any individual player's eligibility to compete at the DGPT event or group events.

(ECF No. 7-11.) This decision revoked Plaintiff's tournament card and barred her from all FPO professional level events, including the OBT Open in Stockton, California, set to take place May 12–14, 2023. (ECF No. 7-1 at 4.) Later that same month, on February 22, 2023, Plaintiff filed her initial complaint in this case. (ECF No. 1.) After filing the complaint Plaintiff's counsel indicates he attempted to engage in settlement discussions. (ECF No. 7-12 at 3.) Then on March 22, 2023, PDGA indicated to Plaintiff that it would not engage in any further settlement discussions. (ECF No. 7-12 at 3.) Plaintiff filed the instant TRO over one month later, on May 3, 2023. (ECF No. 7.)

## II. STANDARD OF LAW

A temporary restraining order is an extraordinary and temporary "fix" that the court may issue without notice to the adverse party if, in an affidavit or verified complaint, the movant "clearly show[s] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The purpose of a temporary restraining order is to preserve the status quo pending a fuller hearing. *See* Fed. R. Civ. P. 65. It is the practice of this district to construe a motion for temporary restraining order as a motion for preliminary injunction. E.D. Cal. L.R. 231(a); *see also Aiello v. One West Bank*, No. 2:10-cv-00227-GEB-EFB, 2010 WL 406092 at *1 (E.D. Cal. Jan. 29, 2010) ("Temporary restraining orders are governed by the same standard applicable to preliminary injunctions.") (internal quotation and citations omitted).

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Costa Mesa City Emp.'s Assn. v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The purpose of such an order is to preserve the status quo until a final determination following a

trial.") (internal quotation marks omitted); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.") (internal quotation marks omitted). In cases where the movant seeks to alter the status quo, preliminary injunction is disfavored and a higher level of scrutiny must apply. *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005). A preliminary injunction is not automatically denied simply because the movant seeks to alter the status quo, but instead the movant must meet heightened scrutiny. *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.* A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* Simply put, the plaintiff must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply in the plaintiff's favor," in order to succeed in a request for preliminary injunction. *Id.* at 1134–35.

**III.    ANALYSIS**

    **A.    Subject Matter Jurisdiction**

Federal question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332 are the two most common forms of federal subject matter jurisdiction. Federal question jurisdiction exists over actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Diversity jurisdiction requires that all plaintiffs be of diverse

5

1   citizenship from all defendants and that the amount in controversy exceeds $75,000.  28 U.S.C. §
2   1332(a); *Exxon Mobil Corp. v. Allapattah Svcs., Inc.*, 545 U.S. 546, 553–54 (2005).
3           When federal subject matter jurisdiction is predicated on diversity of citizenship pursuant
4   to 28 U.S.C. § 1332(a), complete diversity must exist between the opposing parties.  *See*
5   *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996) (stating that the diversity jurisdiction statute
6   "applies only to cases in which the citizenship of each plaintiff is diverse from the citizenship of
7   each defendant").  The burden of persuasion for establishing diversity jurisdiction by a
8   preponderance of the evidence is on the party asserting it.  *Hertz Corp. v. Friend*, 559 U.S. 77, 96
9   (2010); *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 980 (9th Cir. 2013) (citing
10  *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189 (1936) (discussing a party's
11  burden to show that federal jurisdiction is appropriate and that he "justify his allegations by a
12  preponderance of the evidence")).  When challenged on allegations of jurisdictional facts, the
13  parties must support their allegations by competent proof.  *Hertz*, 559 U.S. at 96 (citing *McNutt v.*
14  *Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936)).  "For purposes of diversity
15  jurisdiction, a limited liability company is a citizen of every state of which its owners/members
16  are citizens."  *3123 SMB LLC v. Horn*, 880 F.3d 461, 465 (9th Cir. 2018) (internal quotation
17  marks and citation omitted).
18          In the instant case, DGPT argues the Court lacks subject matter jurisdiction because one
19  or more of their owners or members are citizens of Virginia, the same state Plaintiff is a citizen.
20  (ECF No. 23 at 10.)  To support this argument, DGPT provided a declaration from Margaret E.
21  Holland attesting that DGPT has members who are citizens of Virginia.  (ECF No. 22-8 at 2.)
22  The declaration provides no information as to how or why Ms. Holland has this knowledge, what
23  this knowledge is based on, and importantly provides no documentary evidence supporting this
24  statement.  During the hearing on this matter, DGPT called Mr. Jeff Spring to further support this
25  argument.  Mr. Spring provided the names of three individuals he believed to be both members of
26  DGPT and citizens of Virginia — this included Mr. Steve Dodge whom Mr. Spring was certain
27  lived in Virginia.  In response to this Court's order, DGPT filed supporting evidence allegedly
28  demonstrating four of its members are citizens of Virginia.  (ECF No. 29.)  This filing included a

declaration from Mr. Spring who noted that Mr. Steve Dodge in fact does not live in Virginia and has not lived in Virginia since 2003. (*Id.*) The document also contained photocopied driver licenses from alleged members and unofficial/uncertified tax forms.

Though the Court has some skepticism as to jurisdiction in this case, there is simply insufficient evidence at this time to establish a lack of subject matter jurisdiction. The Court expresses no opinion as to the adequacy of the pleading or DGPT's ability to demonstrate a lack of subject matter jurisdiction at a later time. However, with the limited record currently before the Court, the Court finds DGPT has failed to provide competent proof that its organization contains members who are domiciled in the state of Virginia. Accordingly, this Court cannot find that it lacks subject matter jurisdiction at this time.[3]

### B.    Prohibitory or Mandatory Injunction

The parties dispute whether the relief sought in the TRO is a prohibitory injunction or a mandatory injunction. (*See* ECF No. 7; ECF Nos. 22, 23.) The Court finds Plaintiff seeks a prohibitory injunction.

A preliminary injunction "can take two forms," either a mandatory injunction or a prohibitory injunction. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). "A prohibitory injunction prohibits a party from taking action and preserve[s] the status quo pending a determination of the action on the merits." *Id.* at 878 (citation omitted). "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy." *GoTo.com, Inc.*, 202 F.3d at 1210 (internal quotation marks omitted). In contrast, "[a] mandatory injunction orders a responsible party to take action." *Marlyn*, 571 F.3d at 879 (citation and internal quotation marks omitted). "A mandatory injunction goes well beyond simply

---

[3] Even assuming arguendo that the Court could find DGPT was not a diverse party, which the Court does not find at this time, the case would still proceed. Based on the current state of the record, DGPT is not an indispensable party under Federal Rule of Civil Procedure 19(b). DGPT has stated it recognizes PDGA as the governing body and regulatory authority on this matter and thus DGPT policy is aligned with the PDGA's policy. (ECF No. 7-7.) As a result, injunctive relief based on the PDGA policy would necessarily effect DGPT and provide the relief Plaintiff seeks.

7

1    maintaining the status quo . . . [and] is particularly disfavored." *Id.* (citation and internal
2    quotation marks omitted).

3    Plaintiff's TRO requests "the Court issue an injunction preventing the PDGA and DGPT
4    from excluding Plaintiff from competing in the FPO division of the OTB Open." (ECF No. 7-1 at
5    9.) The only thing currently preventing Plaintiff from participating in the FPO division of the
6    OTB Open is section C.3 of the policy. Indeed, the Court confirmed this during the hearing. The
7    Court asked Plaintiff if it would be correct to say section C.3 is the primary section at issue here,
8    to which Plaintiff responded in the affirmative. Plaintiff further noted that if section C.3 were not
9    in place, Ms. Ryan would be able to compete. Thus, the relief Plaintiff seeks is achieved by
10   enjoining section C.3 of the policy.

11   Defendants argue this requested relief amounts to a mandatory injunction. (ECF No. 22 at
12   10; ECF No. 23 at 9.) Defendants are mistaken. This request is a quintessential prohibitory
13   injunction seeking to prohibit the enforcement of an alleged unlawful policy in order to restore
14   the status quo which preceded this controversy. In this case, the status quo that proceeded this
15   controversy was Plaintiff being able to compete in the FPO division of the OTB Open. (*See* ECF
16   No. 7-3 at 2–3.) Accordingly, the Court applies the prohibitory injunction standard.

17                C.    <u>Plaintiff has Established Serious Questions as to the Merits of Her Claims.</u>

18   Plaintiff's primary claim is Defendants intentionally discriminated against her on the basis
19   of her sex and gender identity in violation of the California Unruh Civil Rights Act. (ECF No. 1.)
20   Because this is Plaintiff's primary claim and the only claim argued in her TRO, the Court limits
21   its analysis accordingly.

22   The Unruh Act provides that "[a]ll persons within the jurisdiction of [California] are free
23   and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability,
24   medical condition, genetic information, marital status, sexual orientation, citizenship, primary
25   language, or immigration status are entitled to the full and equal accommodations, advantages,
26   facilities, privileges, or services in all business establishments of every kind whatsoever." Cal.
27   Civ. Code § 51(b). It further provides that "[n]o business establishment of any kind whatsoever
28   shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or

8

trade with any person [] on account of any characteristic" identified above. Cal. Civ. Code § 51.5(a). The Unruh Act protects against "discrimination on arbitrary grounds." *Harrison v. City of Rancho Mirage*, 243 Cal. App. 4th 162, 172 (2015) (quoting *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 167 (2007)); *see also Howe v. Bank of Am. N.A.*, 179 Cal. App. 4th 1443, 1450 (2009) ("[T]he objective of the Act is to prohibit businesses from engaging in unreasonable, arbitrary, or invidious discrimination." (quoting *Pizarro v. Lamb's Players Theatre*, 135 Cal. App. 4th 1171, 1174 (2006))).

To succeed on an Unruh Act claim Plaintiff must prove: (1) Defendants denied, incited a denial of, discriminated, or made a distinction that denied her full and equal accommodations, advantages, facilities, privileges, or services of their business establishment; (2) that a substantial motivating reason for Defendants' conduct was Plaintiff's protected status or perception of Plaintiff's protected status; (3) Plaintiff was harmed; and (4) Defendants' conduct was a substantial factor in causing Plaintiff's harm. *See* Jud. Council of Cal. Civil Jury Instructions, CACI No. 3060 (Unruh Civil Rights Act—Essential Factual Elements) (2022); *see also* Cal. Civ. Code § 51(b). Further, Plaintiff must prove the discrimination was intentional. *See Harris v. Capital Growth Investors XIV*, 52 Cal.3. 1142, 1149 (1991).

For purposes of the Unruh Act, "'[s]ex' includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth. 'Sex' also includes, but is not limited to, a person's gender. 'Gender' means sex, and includes a person's gender identity and gender expression. 'Gender expression' means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth." Cal. Civ. Code § 51(e)(5).

The Court finds Plaintiff has established serious questions going to the merits of this claim.[4] Defendants raise two primary arguments on this prong, both of which are unavailing. First, Defendants argue Plaintiff has failed to allege intentional discrimination (or discrimination

---

[4] Because Defendants argue the TRO is seeking a mandatory injunction, they apply the heightened standard requiring likelihood of success on the merits. The Court takes no position at this time on Plaintiff's likelihood of success on the merits and finds only Plaintiff has established serious questions going to the merits of her claim.

at all).  (ECF No. 22 at 11–13; ECF No. 23 at 14–15.)  The Court disagrees.  As outlined in the complaint and TRO, and made even more apparent during the hearing, Plaintiff is prevented from competing in the OTB Open based exclusively on her status as a transgender woman.  It is undisputed that but for Plaintiff's status as a transgender woman she would be able to compete in the OTB Open.  It is further undisputed that this policy was created to draw lines that exclude transgender women from the FPO if they do not satisfy the eligibility standards.  Section C is titled "Transgender – Male to Female" and excludes every transgender woman who does not meet all three of the requirements outlined therein.  Thus, it appears there was an intentional act, the creation of a policy, that excludes individuals based on their protected status as transgender women.  The Court makes no determinations as to whether this is sufficient to actually establish intentional discrimination, but it raises serious questions.  These serious questions only intensify when looking specifically at section C.3 of the policy.  This section appears to directly target an individual's sex and gender by creating a temporal line when one must transition.  Those who fail to comport with this timeline are forever barred from the FPO.  This policy seems inextricably tied to sex and gender and, at this stage of litigation, the Court can see no way to separate them.  Accordingly, the Court finds serious questions going to the merits of the intentional discrimination claim.  *See Minton v. Dignity Health*, 39 Cal. App. 5th 1155, 1163 (2019*)* ("Denying a procedure as treatment for a condition that affects only transgender persons supports an inference that Dignity Health discriminated against Minton based on his gender identity.  This is true even if the denial was pursuant to a facially neutral policy.")

Second, PDGA argues they are not a "business establishment" subject to the Unruh Act.  (ECF No. 22 at 14.)  The Court disagrees.  There is sufficient allegations and evidence in the record to establish PDGA would be a business establishment.  *See Nevarez v. City & Cnty. of San Francisco*, No. 19-CV-06155-SK, 2020 WL 13610416, at *4 (N.D. Cal. Feb. 12, 2020) (finding the City's golf courses constituted "business establishments" and the city was subject to Unruh because of their role in running and organizing the golf courses as a place of public amusement) *see also O'Connor v. Village Green Owners Assn.*, 33 Cal.3d 790, 795 (requiring courts to interpret " business establishments of every kind whatsoever" in the broadest sense reasonably

possible).

At this stage the Court further finds there are serious questions going to the remaining elements of an Unruh Act claim. Based on the current record it appears Plaintiff was harmed, as she was denied access to her profession and suffered emotional and psychological injury, and it appears the harm was the direct result of Defendants' alleged discriminatory policy.

For these reasons, the Court finds there are serious questions going to the merits of Plaintiff's claims.

### D. Absent the Relief Requested Plaintiff is likely to Suffer Irreparable Harm

Defendants argue Plaintiff has failed to establish she will suffer irreparable harm. Defendants first assert Plaintiff's delay in filing her TRO dooms her request for relief. (ECF No. 22 at 6–15; ECF No. 23 at 15.) Defendants argue this delay amounts both to a procedural defect and is evidence of lack of irreparable harm.[5] As an initial matter, the Court agrees that Plaintiff delayed filing the instant TRO. By waiting to seek last-minute relief from this Court, Plaintiffs created needless urgency that has handicapped Defendants' ability to respond and the Court's ability to address the parties' arguments as thoroughly as it otherwise would have. The question here becomes whether Plaintiff's delay nullifies her irreparable harm. The Court finds it does not.

Plaintiff is a professional woman disc golfer. It is her job, her means of income, and an expression of her gender identity. Her reputation, professional ranking, income, and ability to grow within the league are all tied to her membership in the FPO division. For Plaintiff, however, membership in the FPO appears to transcend these metrics. She contends FPO membership affirms her gender identity, secures her emotional wellbeing, and prevents her from being "othered" simply because she is a transgender woman. This is supported by Plaintiff's declaration filed with her TRO (ECF No. 7-3) and with the letter written by Plaintiff and read aloud in Court during the hearing. Plaintiff asserts that absent relief here, she will face significant

---

[5] PDGA dedicates over one page of their opposition to citations where Court's in this district have denied TROs for failure to timely file pursuant to Local Rule 231(b). Local Rule 231(b) notes that a court *may* conclude a delay constitutes laches or contradicts the applicant's alleged irreparable injury and the court *may* deny the motion solely on those grounds. The Court declines the invitation to deny the TRO on this basis as the Court does not find, under these specific circumstances, the delay was so unduly as to warrant denial or constitutes laches.

emotional and psychological harm resulting in part from the denial of her gender identity. Plaintiff cited increased depression, anxiety, and emotional turmoil as evidence of such psychological harm at the hearing. The Court finds this showing of irreparable harm to be compelling.

When weighed against the delay, the Court finds Plaintiff has demonstrated the delay in this case does not nullify the profound irreparable harm that could occur without relief. Absent relief here, Plaintiff will likely suffer continued emotional distress and psychological harm. Accordingly, Plaintiff has met her burden in establishing irreparable harm. *See Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015) ("Emotional distress, anxiety, depression, and other psychological problems can constitute irreparable injury.")

### E. The Balance of Equities Tips Sharply in Plaintiff's Favor

Defendants once again raise delay as a reason for denying Plaintiff's TRO. (ECF No. 22 at 18; ECF No. 23 at 15–17.) The Court, however, finds the delay does not disrupt the equities in this case. On Plaintiff's side of the scale rests her professional career as woman disc golfer, her gender identity, her ability to continue to make a living as she has since at least 2019, her mental and emotional health, and her fair access to a professional sport as a woman. (ECF No. 4 at 4–6; ECF No. 7-3 at 2–4.) Defendants fail to allege any harm or equitable consideration that would weigh directly in their favor. Rather, on Defendants' side of the scale rests the alleged harm the other competitors would face and the complications that could arise due to point counts and point totals. (*See* ECF No. 23 at 7–8, 18.) Defendants also argue Plaintiff's alleged unfair advantage for having gone through male puberty weighs against her. (*Id.* at 18; ECF No. 22 at 18–20.)

In weighting the equities, the Court finds the balance tips sharply in favor of Plaintiff. The argument that some competitors may be scored lower, lose points, or otherwise perform worse because Plaintiff is participating in the OTB Open is a minimal hardship rooted in speculation, as it is unknown how high Plaintiff with place in the competition. The argument that other competitors are at a disadvantage because Plaintiff went through male puberty and that Plaintiff's participation disrupts competitive fairness is unpersuasive based on the evidence

currently before the Court. This argument appears rooted in a fallacy likely born from a dearth of research. None of the scientific evidence presented in this case studied transgender athletes and none of the scientific evidence sought to determine whether transgender athletes, having gone through significant physical and psychological change, have a disproportionate advantage to their teammates or competitors. Conclusions that transgender women athletes will perform better than their cis-gender competitors are based on comparisons between the development of cis-men to cis-women, and on some research about physiological changes that occur during transitioning. These comparisons appear not to consider the myriad of factors and forces that effect an individual who has transitioned, including changes in body chemistry, physiology, psychology, etc. For these reasons, the Court at this time cannot say Plaintiff's participation threatened competitive fairness.

For the reasons discussed above, the Court finds the balance of the equities tips sharply in Plaintiff's favor.

### F.  An Injunction is in the Public Interest

Defendants argue granting Plaintiff's TRO is not in the public's interest. Specifically, Defendants argue there is a public interest in maintaining a policy supported by scientific analysis that is consistent with other gender specific sports leagues. (ECF No. 22 at 20.) Defendants also argue granting an injunction would unfairly affect other women athletes in the tournament, which is against the public interest. (ECF No. 23 at 19.)

The Court recognizes the difficulties this case presents. To determine whether this injunction is in the public interest, the Court looks at guidance from leaders in the athletic world. The International Olympic Committee ("IOC") is among those leaders. As the parties have all noted, the IOC promulgated a framework related to the inclusion of individuals in sports based on gender. (ECF No. 25-3). This framework states "[e]veryone, regardless of their gender identity, expression and/or sex variation should be able to participate in sport safely and without prejudice." (*Id.* at 2.) The IOC counsels for inclusion and the prevention of discrimination. The PDGA asserts the rules were created in response to the IOC framework and represented during the hearing that the PDGA policy is in line with this framework. However, when the policy is

compared to the IOC framework, there appear to be significant discrepancies. The IOC framework mandates "[t]he physical, psychological and mental well-being of athletes should be prioritized when establishing eligibility criteria." (*Id.* at 3.) However, the PDGA medical subcommittee report explicitly states, "it does not include sociological, psychological, or cultural issues surrounding transgender participation in competitive athletics." (ECF No. 22-1 at 1.)

The IOC framework also counsels "[n]o athlete should be precluded from competing or excluded from competition on the exclusive ground of an unverified, alleged or perceived unfair competitive advantage due to their sex variations, physical appearance and/or transgender status." (ECF No. 25-3 at 4.) It goes on to say "[u]ntil evidence (per principle 6) determines otherwise, athletes should not be deemed to have an unfair or disproportionate competitive advantage due to their sex variations, physical appearance and/or transgender status." (*Id.*) Based on this Court's review of the PDGA's medical subcommittee report, neither of these principles were honored. There is currently insufficient evidence in the record to support a finding that Plaintiff has an unfair or disproportionate competitive advantage. The assumption that she will have an unfair competitive advantage seems to be based on the "unverified" and "perceived" notion that because Plaintiff is transgender and went to male puberty, she will be better. These discrepancies between the IOC framework and the PDGA policy counsel in favor of granting the TRO.

Additionally, the trend in women's sporting events appears to be more inclusive than the policy in the instant case. As discussed at the hearing the NCAA, NWSL, and WNBA all have policies in place governing gender qualifications and none of them require transition prior to male puberty as the PDGA policy section C.3 does. Taken together, the IOC's guidance and the trend in professional sports organizations not to require transition prior to puberty are persuasive and sufficient to demonstrate an injunction here is in the public's interest.

For the reasons outlined above, the Court finds an injunction here is in the public's interest.

### IV.   CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Plaintiff's Motion for a Temporary Restraining Order. (ECF No. 7.) Defendants are hereby ENJOINED from enforcing, using,

implementing, or otherwise relying on section C.3 of the Policy on Eligibility for Gender-Based Divisions for any purpose, including but not limited to preventing Plaintiff from participating in the 2023, FPO division of the OTB Open in Stockton, California.

IT IS SO ORDERED.

DATE: May 11, 2023

_____
Troy L. Nunley
United States District Judge